Arturo Pinto, demandante y apelante, *v.* La Sucn. Desconocida de Andrew Peter Drew, hoy comparecida por sus hermanos Thomas, Mary, Margarete y Catherine P. Drew, demandada y apelada.

No. 5988.—*Sometido:* Abril 25, 1933. *Resuelto:* Diciembre 22, 1933.

952

*V. Polanco de Jesús,* abogado del apelante; *L. Mendín,* abogado de la apelada.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

Arturo Pinto demandó en la Corte de Distrito de Arecibo a la Sucesión desconocida de Andrew Peter Drew en cobro de cuatro mil dólares e intereses garantizados con hipoteca y de setecientos cuarenta dólares más por cantidades facilitadas en vida a Drew para diversas atenciones.

En el pleito se personaron Margaret Anne, Tomás, Mary S. y Catherine Drew, hermanos de Andrew Peter Drew, como componentes de su Sucesión, y suscitaron varias cuestiones previas que fueron declaradas sin lugar contestando final-

mente la demanda. Negaron la existencia de deuda alguna por parte de su causante para con Pinto alegando la simulación de las escrituras de hipoteca a que la demanda se refiere.

Solicitó el demandante la eliminación de varios particulares de la contestación y alegó que ésta no exponía hechos suficientes para determinar una causa de oposición a la demanda. Ordenó la corte algunas de las eliminaciones solicitadas y negó otras y declaró sin lugar la excepción previa.

Trabada así la contienda, fué el pleito a juicio. Ambas partes practicaron su prueba y la corte decidió el caso en contra del demandante, declarando probados los siguientes hechos:

"Que en primero de mayo de 1929, el causante de la sucesión demandada, Andrew Peter Drew, otorgó ante el notario don Victoriano M. Fernández, una escritura de préstamo e hipoteca, número 35, por virtud de la cual reconoció adeudar a Arturo Pinto la suma de $2,000, haciéndose constar en dicho documento que esta cantidad había sido recibida del prestamista en sumas parciales y que habiéndose liquidado en la fecha del otorgamiento de la escritura daban el montante mencionado; . . . . . Para garantizar el pago de los $2,000 y de $400 de crédito adicional, Andrew Peter Drew constituyó primera hipoteca voluntaria sobre tres fincas pertenecientes a la sociedad de gananciales que existía entre él y su esposa. Las fincas gravadas se describen así:

(Se describen tres fincas rústicas situadas en el Barrio de Coto, de Manatí, compuestas de diez, ocho y catorce cuerdas.)

"Que el día 3 de mayo de 1929, se otorgó por el causante de la demandada Andrew Peter Drew la escritura número 37 del protocolo del Notario Victoriano M. Fernández, por virtud de la cual el referido Andrew Peter Drew confesó haber recibido con anterioridad al acto del otorgamiento del documento, de manos de Arturo Pinto, la suma de $2,000 más en calidad de préstamo y en su consecuencia se comprometió a satisfacer la cantidad de $4,000 al acreedor en el término de dos años retrotrayendo la fecha a la del otorgamiento de la escritura número 35, o sea el primero de mayo de 1929, y para responder del pago del montante antes referido, amplió la hipoteca que había constituído sobre las tres fincas    .    .

"Que en noviembre 15 de 1929 se satisfizo por Arturo Pinto a

Ignacio Valderrama la suma de $112 que Andrew Peter Drew adeudaba a dicho señor.

"Que en mayo 3 de 1929 se satisfizo por el demandante Pinto al Lcdo. Victoriano M. Fernández la suma de $52.45 en pago de servicios profesionales prestados en el otorgamiento de las escrituras número 35 y 37 de primero y tres de mayo respectivamente, que ya hemos mencionado anteriormente.

"Que en mayo 5 de 1929 se pagó por el demandante al Lcdo. José R. Rodríguez Cebollero la suma de $10 para atender a los gastos del caso de Rosalía Kelly.

"Que en mayo 17 de 1929 el demandante pagó al Lcdo. Antonio Quirós Méndez la suma de $10 por servicios profesionales prestados en el otorgamiento de la escritura número 17 al señor Andrew Peter Drew.

"Que en primero de diciembre de 1929 el demandante pagó la suma de $25 al Lcdo. Gustavo Cruzado Silva para cubrir honorarios en el caso de Rosalía Kelly *versus* Andrew Peter Drew.

"Que en diciembre 16 de 1929 el demandante pagó la suma de $80 al Lcdo. Gustavo Cruzado Silva para cubrir honorarios devengados por éste en la defensa del caso seguido contra Andrew Peter Drew por Rosalía Kelly.

"Que en mayo 5 de 1930 el demandante terminó de pagar la suma de $209.98 a Tabacaleros de Manatí, Morovis y Barceloneta Inc. a nombre de Mr. Drew.

"Que en agosto 30 de 1929 el demandante satisfizo la suma de $36.49 por concepto de contribuciones adeudadas por las fincas de Andrew Peter Drew y en febrero 17 de 1930 satisfizo la misma cantidad. También el demandante satisfizo otras pequeñas cantidades ascendentes a $11.35.

"Que en septiembre 6 de 1926 Arturo Pinto escribió una carta a Andrew Peter Drew que copiada literalmente dice así:

" 'Santurce Sep. 6/26.—My dear Mr. Drew: Yesterday I was in Manatí and was going to call on you when a visitor arrived and I had to take care of him while María was preparing some dinner.— But though probably I will be there again, on the coming Sunday, I just wish to know if it is true you are contemplating selling some of your low land and what will be your price per *cuerda* in case you feel like selling a small portion of it.—You know how often I have expressed my desires of having a piece of land, and if we could come to an understanding, I on my part will do a little sacrifice in trying to obtain some.—With best regards, and best wishes for your good health, I am as always, affectionately yours, Arturo.—P. S. If

you can't write, please advise María if you don't want to wait till Sunday.'

"Que las tres fincas dadas a garantía por Andrew Peter Drew al demandante Pinto aparecen inscritas en el registro de la propiedad a nombre de Drew; habiendo adquirido la de 14 cuerdas, siendo casado, por compra a Blasina Crespo el primero de noviembre de 1905 e inscrito la misma a virtud de un expediente posesorio en el cual se hizo constar que el valor de dicha parcela era de $160. Las dos fincas restantes de 8 cuerdas 75 céntimos y 10 cuerdas, las adquirió Drew siendo casado con Catherine Drew, por compra a Thomas Ronan y Catalina Pickering por precio: la de 8 cuerdas de $400 y la de 10 cuerdas de $300 en escritura número 37 otorgada en Manatí a 22 de mayo de 1929 ante el Notario Ignacio Carballeira Cañellas.

"Que para los efectos contributivos, la finca de 14 cuerdas está valorada por Tesorería en $1,180 y paga $26.68 anuales; la finca rústica de 8.75 cuerdas está valorada en $590 y paga $13.34 anuales y la finca de 10 cuerdas está valorada en $580 y paga $13.12 anuales.

"Que el demandante Arturo Pinto aparece como contribuyente sobre la propiedad en el municipio de Manatí, para el año económico de 1930–31, poseyendo las siguientes propiedades: un solar de 400 metros cuadrados con dos casas ubicadas en la calle Barbosa de Manatí, valorado en $1,800 y una finquita rústica de 8 cuerdas valorada en $300.

"Que allá por el día 9 de abril de 1929 y en el barrio Coto de Manatí, Andrew Peter Drew acometió y agredió a Rosalía Kelly causándole varias lesiones y contusiones en distintas partes del cuerpo, por cuya virtud el referido Andrew Peter Drew fué procesado ante la Corte Municipal de Manatí, dictándosele sentencia el 11 de abril de 1929 condenándole a pagar $50 de multa o un día de cárcel por cada dólar que dejase de satisfacer.

"Que a consecuencia del acometimiento y agresión realizado por Andrew Peter Drew en la persona de Rosalía Kelly, ésta radicó, ante la corte de distrito de San Juan, demanda en resarcimiento de daños y perjuicios contra aquél (Caso civil 9331) reclamándole la cantidad de $2,000 en concepto de indemnización. Dicha demanda fué radicada en la corte de distrito de San Juan, el 22 de abril de 1929.

"Que Andrew Peter Drew falleció en Manatí, P. R., el día primero de julio de 1930 sin dejar ascendientes ni descendientes de clase alguna y dejando cuatro hermanos nombrados Thomas, Mary, Margaret y Catherine P. Drew.

"Que en 28 de agosto de 1930 se radicó ante este tribunal por el demandante Arturo Pinto un informe por escrito notificando a la corte el fallecimiento del referido Drew, sin haber dejado hijos, esposa ni parientes cercanos y haciendo constar que el informante era apoderado del fenecido al tiempo de su fallecimiento, con poder ante Notario, el cual acompañó a dicha solicitud y solicitando, al propio tiempo, que de acuerdo con las disposiciones del artículo 21 y 22 de la Ley de Procedimientos Legales Especiales se tomasen aquellas medidas pertinentes por la corte para proteger los bienes relictos del óbito de Drew.

"Por la escritura de poder que acompañó el demandante a su solicitud, ha quedado demostrado que Mr. Andrew Peter Drew otorgó a favor de Arturo Pinto el demandante, por la escritura número 17 de fecha 17 de mayo de 1929, otorgada ante el Notario R. A. Quirós Méndez, poder general amplio para administrar todas las propiedades del poderdante, recaudar sus rentas y productos, cobrar cuentas adeudádales, comprar bienes, vender los ya poseídos y, en fin, ejercitar todos aquellos actos relativos a la persona y bienes de Mr. Drew.

"Que al día siguiente del fallecimiento de Andrew Peter Drew el demandante Pinto en unión de su madre María Andino y su esposa Juana Rosado se personaron en la residencia del fenecido e iniciaron una búsqueda en los baúles de aquél recogiendo ciertos documentos y mandando a quemar el resto."

Expuesto lo que antecede, siguió diciendo la corte sentenciadora en su relación del caso y opinión:

"Probados los extremos anteriormente expuestos, quedan dos únicas cuestiones primordiales en disputa a resolver.

"Si las escrituras de hipoteca otorgadas por Andrew Peter Drew a favor de Arturo Pinto fueron simuladas.

"Y, si las cantidades satisfechas por Arturo Pinto, en vida de Mr. Andrew Peter Drew y a nombre de éste, lo fueron con dinero de aquél en calidad de préstamo a éste, o si dichos pagos sólo representaban parte de las facultades que como apoderado de Drew poseía Pinto.

"Del conjunto de toda la evidencia aportada en este caso, la Corte arriba a la conclusión de que las dos escrituras de constitución de hipoteca fueron simuladas, sin que mediara consideración alguna en sus otorgamientos."

Expresa entonces extensamente los motivos que la lleva-

ron a la anterior conclusión, y con respecto a la segunda
cuestión que anunciara, dice:

"En cuanto a las cantidades reclamadas por el demandante en
su segunda causa de acción opinamos que aparte de que muchas de
las partidas constantes en el detalle adjunto a la demanda no han
sido satisfactoriamente probadas, surge en nuestra mente una gran
duda respecto a las condiciones en que el demandante Pinto, efec-
tuaba esos pagos a nombre de Drew. Y esa duda tiene como funda-
mento el hecho de que, siendo Pinto apoderado de Andrew Peter
Drew, según la escritura de poder número 17 de 17 de mayo de 1929,
otorgada ante el Notario R. A. Quirós Méndez, y siendo ese poder
tan amplio que, no sólo se le otorgaba por el poderdante facultad
para recibir los productos y rentas de las fincas, sino hasta para ven-
derlas e hipotecarlas, no nos ha convencido el demandante de que
esas cantidades por él pagadas a nombre de Drew, lo hubiesen sido
con dinero de su peculio, porque, muy bien pudieron haber sido he-
chos los pagos con el dinero de Mr. Drew, ya que Pinto era apode-
rado y la persona que manejaba todos los intereses del finado."

No conforme el demandante apeló para ante esta Corte
Suprema. Diez y ocho errores señala en su alegato, refirién-
dose los dos primeros a la moción eliminatoria y a las excep-
ciones previas presentadas por el demandado. A nuestro
juicio ninguno de ellos fué cometido.

Quizá hubo exceso de alegaciones en la contestación, re-
peticiones innecesarias y apreciaciones impertinentes que es-
trictamente debieron eliminarse, pero al no acceder a ello
estamos convencidos de que la corte no cometió error perju-
dicial alguno.

■ Por la excepción se suscitó la cuestión de que la con-
testación no aducía hechos suficientes para determinar una
causa de oposición porque no siendo los demandados herede-
ros forzosos sino voluntarios no tenían derecho alguno a ale-
gar la simulación de las escrituras otorgadas por Andrew
Peter Drew.

Son herederos los que por disposición del testador o por
ministerio de la ley suceden al difunto a su muerte y a título
universal en todos sus derechos y obligaciones, dividiéndose

en testamentarios o instituídos y en legítimos o abintestato, siendo los primeros los que se subdividen en forzosos y voluntarios. 17 Enciclopedia Jurídica Española 715.

Aquí no hubo testamento. Tampoco descendientes ni ascendientes. Sólo existen al parecer hermanos que la ley llama en tal caso a la herencia. Su interés es manifiesto. De los hechos que exponen en su contestación no se deduce que fuera la voluntad de su causante la de reconocer graciosamente y para siempre a Pinto la suma que trata éste de cobrar en su demanda; al contrario, de ellos resulta que el reconocimiento de la deuda se hizo sólo temporalmente quedando Drew en posesión de un contradocumento otorgádole por Pinto.

Dice Manresa en sus Comentarios al Código Civil:

"Tiene declarado la jurisprudencia en sentencia de 18 de abril de 1901, de acuerdo con la regla aquí formulada, que 'quien no ha sido parte de un contrato, ni tiene causa ni representación de los que intervinieron en él, es evidente, conforme a lo dispuesto en los arts. 1257 y 1302 del Código Civil, que carece de acción y personalidad para impugnar la validez de aquél.'

"Como se ve por la misma doctrina, y es de toda evidencia, corresponde a los herederos deducir la acción de nulidad; pero esto se encuentra subordinado a que sus causantes pudieran haberla intentado, y así se declara en la doctrina que con motivo del artículo 1306 recogemos." 8 Manresa. Comentarios al Código Civil 738, Ed. 1901.

Y en este caso el causante hubiera podido oponer la simulación a la reclamación de Pinto.

■ Tampoco se cometió el tercero de los errores señalados. La Corte no erró al admitir prueba sobre el proceso que se siguiera a Andrew Peter Drew por acometimiento y agresión a Rosalía Kelly. La evidencia, unida a otra que luego se aportara, tendía a explicar el motivo de la simulación alegada por los demandados y era, en tal virtud, pertinente.

■ Los errores cuarto y décimoquinto están estrechamente relacionados. Sostiene el apelante que la corte erró

al declarar probada la existencia de un pleito iniciado por Rosalía Kelly contra Andrew Peter Drew en reclamación de daños y perjuicios con motivo de haber sido acometida y agredida por Drew y en haber decretado que se uniera a los autos, tomándola luego en consideración para dictar su sentencia, cierta certificación relativa a la existencia de dicho pleito cuya admisión negó cuando fué presentada en evidencia por los demandados.

Nos inclinamos a creer que erró la corte sentenciadora al actuar en la forma indicada, pero su error no debe ser motivo de revocación porque no perjudicó al demandante ya que el hecho de la existencia del pleito se encuentra demostrado por prueba independiente de la certificación.

■ El error décimoctavo se formula así:

"Erró la Corte al decretar la nulidad de las hipotecas del demandante, sin que hubiera mediado una contrademanda de los demandados solicitando específicamente dicha nulidad, amén de que los demandados no, establecieron su capacidad de herederos de Andrew Peter Drew."

La sentencia se limitó a declarar la demanda sin lugar, por supuesto, sobre la base de la no existencia de los créditos garantizados con las hipotecas. Bajo las circunstancias del caso, no creemos que fuera necesaria la radicación de una contrademanda. La simulación pudo alegarse como se alegó en la contestación como materia nueva constitutiva de defensa y oposición a la demanda.

■ Y en cuanto a que los demandados no probaron que fueran los herederos de Andrew Peter Drew, bastará decir que la demanda se interpuso contra los herederos desconocidos de Drew, que los demandados comparecieron alegando su condición de herederos por ser hermanos de Drew y no existir testamento, ni descendientes ni ascendientes, enmendando entonces el demandante su demanda incluyéndolos como demandados, y que al terminar su caso el abogado de los demandados dijo y quedó en el récord sin objeción alguna lo que sigue: "Abogado Sr. Mendín. Se admitió por la parte

contraria que los demandantes son componentes de la sucesión Drew y omitimos presentar este expediente.   Es nuestro caso.''

Ello era suficiente para reconocerles personalidad en el pleito.   La herencia de Drew no fué adjudicada en el mismo. Fué liberada simplemente de la reclamación del demandante. No hubo error.

■ Los errores 5, 6, 8, 9, 10, 11, 12, 13, 14 y 16 se refieren a la apreciación de la prueba en relación con la simulación.   Los estudiaremos conjuntamente.

¿Demuestra la evidencia practicada que las escrituras de hipoteca no constituyen la expresión de la verdad?   Veámoslo.

La evidencia presenta a Andrew Peter Drew a la fecha de los sucesos origen de este pleito como un anciano, de estado viudo, que envejeció trabajando en fábricas de azúcar en el empleo que se conoce como ''azucarero,'' y estaba en posesión de tres pequeñas fincas rústicas adquiridas siendo casado.   En abril de 1929 se le denunció ante la Corte Municipal de Manatí por haber acometido y agredido a Rosalía Kelly y según la copia de la sentencia dictada por dicha corte el día once de dicho mes y año, se le declaró culpable.   Solicitó de la corte que suspendiera la ejecución de la sentencia en atención a su edad—más de ochenta años—y la corte accedió.

Poco después recibió unos documentos.   Mandó a buscar a Manuel Marchán González y, según éste declara:

''Me dijo que la señorita Rosalía lo había denunciado otra vez y me enseñó unos papeles, y le dije, que no era denunciado, sino que era una demanda por daños y perjuicios, y me habló para que fuera a donde el Lcdo. Rodríguez Cebollero para que se encargara de la defensa y me aplazó para buscar dinero para ello, y a los dos días me mandó donde el Sr. Santiago Crespo para que mandara el dinero para entregar a Rodríguez Cebollero, y me entregó Santiago Crespo ocho pesos, dos para mis gastos y seis para el Lcdo. Rodríguez Cebollero.  Fuí a San Juan al día siguiente y entregué al Lcdo. Rodríguez Cebollero los papeles y dí la razón de Drew y entregué

los seis pesos y el Lcdo. Rodríguez Cebollero hizo una declaración jurada o affidavit de mérito para el traslado del caso.''

Santiago Crespo, a quien el testigo se refiere, declaró que tenía arrendadas veinte y cuatro cuerdas de terreno a Drew por ciento cincuenta pesos al año, pagando el canon a Drew y últimamente a Pinto, su apoderado, a quien llegó a satisfacer $82.50. Dijo que Drew vivía pobremente, solo, en una casa con escasos muebles, trabajando siempre hasta morir, que era ''un hombre que no estaba por orgullo.''

El apoderado Pinto es el demandante en este pleito. Parece que tenía una estrecha amistad con Drew. Cuando Drew vino a San Juan a hacerse reconocer en el Hospital Presbiteriano, se hospedó en su casa, encargándose Pinto de todas las diligencias y del pago de todos los gastos, y cuando se vió demandado por Rosalía Kelly a Pinto recurrió en solicitud de auxilio. Fué Pinto el que hizo que interviniera el abogado Cruzado Silva a quien pagó por honorarios primero veinte y cinco pesos y luego ochenta en diciembre 1º. y diciembre 16, 1929, respectivamente, habiendo pagado antes, en mayo 5, 1929, por igual concepto al abogado Rodríguez Cebollero diez dólares. Todo esto consta de la prueba del propio demandante.

Contestando a repreguntas del abogado de los demandados declaró Pinto que era un empleado de correos que ganaba ciento ochenta pesos mensuales, que estuvo en Nueva York y empezó a trabajar en una fábrica de jabón como obrero, regresando a Puerto Rico con seis mil pesos ahorrados. Abrió una cuenta en el Banco Territorial de Manatí y la mayor parte del dinero se la dió a guardar a su padre, sin poder precisar la cantidad porque de eso hacía a la fecha del juicio—marzo de 1931—unos ocho años.

Repreguntado: ''¿Cuándo usted le dió los dos primeros mil dólares a Mr. Drew, objeto de la escritura No. 35, cómo hizo esas entregas a Mr. Drew?'' Contestó: ''Mi padre me salió a coger prestado un dinero o salí a comprar la finca y no me la vendió y después tuvo ciertas necesidades y había

cierta amistad entre él y yo y me pidió dinero prestado y le dije a mi padre: si fulano va a donde tí dale el dinero.''

Siguió contestando que le hizo tres préstamos, no recordando las fechas. No conservó los datos. Dijo que habiéndose otorgado la escritura, documento público, le parecía que todo lo otro era nulo.

La segunda escritura de hipoteca se otorgó tres días después de la primera. Dijo Pinto que le había entregado los dos mil dólares a Drew en dinero pareciendo indicar que lo hizo a presencia del notario mismo, y cuando se le llamó la atención de que el notario no daba fe en la escritura de la entrega del dinero, contestó: ''De eso no sé; no puedo responder. Habría que llamarle la atención a él.''

Al pedirle que explicara cómo no obstante haber percibido Drew esa suma de dinero el mismo día aparece él, Pinto, pagando por Drew al Notario los honorarios, manifestó: ''Voy a explicar. El individuo necesitaba dos mil pesos y los necesitaba completos y dice: paga al abogado que tú y yo después arreglamos eso. Él necesitaba no sé para qué negocio los dos mil pesos completos.''

Catorce días después, el 17 de mayo de 1929, Drew otorgó poder general por escritura pública a Pinto y explicando éste los motivos que existieron para ello, dijo: ''Porque se sentía malo y necesitaba a uno que pudiera ir al campo y atenderlo.''

Aunque en realidad de verdad no puede asegurarse que fuera imposible que Pinto regresara de los Estados con seis mil dólares ahorrados del producto de sus jornales o que con el sueldo que tenía pudiera sufragar sus gastos y ahorrar cuatro mil dólares para prestarlos a Drew, comienza a llamar la atención que ello pudiera ser así.

Y sigue llamando la atención que puestas en tela de juicio las escrituras, Pinto no explicara con datos precisos cómo y cuándo se hicieron los tres préstamos que se refundieron en la primera hipoteca de dos mil dólares, tratando de hacerse fuerte en lo consignado en el mismo documento, tanto

más cuanto que luego declaró que llevaba una especie de contabilidad, y continúa la atención intensificándose cuando surge el segundo préstamo de dos mil dólares y Pinto se muestra ignorante del uso que Drew hiciera del dinero así adquirido, habida en consideración las íntimas relaciones que con él tenía que culminaron en el otorgamiento unos días después del poder generalísimo, subiendo de punto lo raro del caso si se toma en consideración el valor de las fincas y que Drew sólo era dueño de la mitad de las mismas correspondiendo la otra mitad a los herederos de su esposa.

Todo ello, por sí solo, no podría servir de base, sin embargo, para dejar de reconocer eficacia a las escrituras. Pero hay más. Los amigos y relacionados que visitan a Drew no advierten cambio alguno en su vida—que califican de pobre. Ningún nuevo negocio emprende. Ninguna cuenta pendiente salda. Al contrario, según la prueba del propio demandante es éste el que tiene que pagar todo por él. Los dos mil dólares se esfuman sin que dejen el más leve rastro.

Y aun hay más. Cuando llegan los últimos momentos de Drew, ningún familiar está a su lado. Es Pinto el que dispone, el que lo ordena todo. ¿Y cómo actúa? Lo sabemos a virtud de la deposición de Hermenegilda Colón y de las declaraciones de Natividad Menéndez e Inés Collazo.

Hermenegilda Colón aseguró que había escuchado de labios del propio Drew que había hecho una hipoteca simulada con Pinto, ampliando luego su contestación así: "Él me dijo que había hecho una hipoteca simulada por haber tenido él un pleito con Rosalía Kelly . . . Él me dijo que había hecho un contradocumento." Y aseguró que vió a Pinto en casa de Drew "un día después de la muerte," acompañado de María Andino y Juana, su madre y esposa, respectivamente, que "recogieron los baúles, rebuscaron y encontraron ciertos documentos y entonces mandaron a quemar el resto."

Natividad Menéndez dijo que al morir Drew fué mucha gente a la casa: "la señora María Andino, el Sr. Pinto, y todos los que querían ir a ver el muerto" . . . que "la se-

ñora Andino estuvo en el baúl y sacó los papeles y se los entregó a la *yerna*" . . . la *yerna* es "la señora de Pinto y se fueron con los papeles y no volvieron . . . la mitad de los papeles quedaron en el baúl y Arturo Pinto mandó a un señor que está aquí, que viene de testigo, que los quemara."

El testigo a que se refería Natividad Menéndez era Inés Collazo. Declaró que vivía en la "estancia del Maestro Andrew," y que al día siguiente de su muerte quemó, por orden de Pinto, unos papeles que sacaron de un baúl que estaba abierto.

Al tomarse la deposición de Hermenegilda Colón el demandante hizo objeción a que declarara sobre lo que le dijo Drew y la deposición fué admitida sujeta a las objeciones consignadas. En su alegato insiste el apelante en que la prueba era inadmisible. Aceptando, sin resolverlo, que lo fuera, y prescindiendo de ella para la formación de nuestro juicio, creemos que la prueba de la búsqueda en el baúl de Drew y el apoderamiento de documentos, acto que se niega por Pinto, unida a todas las otras circunstancias que concurren en el caso, es suficiente para sostener la conclusión a que llegara el juez sentenciador, a saber:

"Que estas escrituras fueron otorgadas simuladamente por Mr. Drew en favor de Pinto para evadir la reclamación de daños y perjuicios interpuesta por Rosalía Kelly, surge de los propios términos de los documentos y de todas las circunstancias que rodean estas relaciones contractuales."

¿Tuvo también razón la corte de distrito al declarar sin lugar la segunda causa de acción?

Siguiendo en su razonamiento después de exponer lo que anteriormente transcribimos, se expresó así la corte en su relación del caso y opinión:

"De modo que, aquellas partidas que Pinto ha demostrado haber satisfecho a otras personas a nombre de Mr. Drew, el juzgador acepta como probado que efectivamente, Pinto satisfizo esas cantidades. Ahora, ¿con dinero de quién? ¿De su poderdante o de él mismo? Ésa es la laguna que dejó sin llenar el demandante en

su prueba. Y nos explicamos este lapsus, porque jamás el deman-
dante ni en su demanda ni en su prueba menciona el hecho de haber
sido apoderado de Mr. Drew. Esta circunstancia surgió en el curso
de la prueba de la demandada, quien presentó el expediente ín-
tegro, incoado por el demandante, sobre administración de los bienes
del finado sin parientes conocidos, unido al cual sometió en eviden-
cia la escritura de poder.

"El juzgador, con esa evidencia, no está en condiciones de deci-
dir si las cantidades pagadas por Pinto a terceras personas, pueden
ser consideradas como préstamos efectuados al finado Drew. Y ha-
biendo una ausencia completa de prueba en cuanto a este extremo,
la presunción es que tales cantidades eran satisfechas por Pinto
con el dinero de las rentas de Drew, en su carácter de apoderado
de éste; y siendo ello así, no puede Pinto recobrar sumas que, si
bien fueron pagadas por él, no fueron desembolsadas de su peculio,
sino del haber de su poderdante."

Conocemos por la prueba que el poder fué efectivo. Por
lo menos sabemos que Pinto recibió seis meses de cánones de
arrendamiento de veinte y cuatro cuerdas de terreno de Drew.
Con respecto a este extremo declaró el propio Pinto: "¿Mr.
Drew tenía arrendadas sus fincas? . . . .¿A quién la tenía
arrendada?—A Santiago Crespo.—¿Cuánto pagaba?—"No
recuerdo cuánto pagaba.—¿Recibió dinero después de Drew
haber otorgado la escritura de hipoteca?—Sí, señor, y se lo
entregué a Drew.—¿Recuerda cuándo recibió el dinero?—
Tendría que ver los libros para ver cuándo lo recibí. No re-
cuerdo la fecha para decir tal día o mes.—¿Cuando recibió
el dinero de Crespo recuerda qué cantidad recibió?—Le digo
que no recuerdo con exactitud ni cuánto fué ni el día que
fué."

Nos damos cuenta del estado de conciencia del juzgador al
pesar toda la prueba practicada. Quizá haya algo de verdad
en estas últimas reclamaciones, pero la falta de crédito del
testimonio de Pinto en lo esencial daña su causa. Atendidas
todas las circunstancias concurrentes, no creemos que el cri-
terio adoptado por la corte sentenciadora fuera erróneo.

El décimosexto error se refiere a la imposición de las costas. Si las conclusiones de la corte con respecto a las causas de acción ejercitadas por el demandante, están bien establecidas, como hemos reconocido que lo están, entonces no hay duda alguna con respecto a la imposición de las costas. Debe necesariamente satisfacerlas el demandante. No existe el error.

*Procede la confirmación de la sentencia.*